THOMAS v. SULLIVAN.

1. DEEDS—DELIVERY—PRESUMPTION.

Where a deed is delivered by the grantor to a third person, there is no presumption that such delivery is for the use of the grantee.

2. SAME—SUFFICIENCY OF EVIDENCE.

> On a bill to cancel a deed delivered to a third person, evidence considered, and *held* not to show a delivery for the use of the grantee.

Appeal from Berrien; Coolidge, J.   Submitted October 20, 1904.   (Docket No. 63.)   Decided November 29, 1904.

Bill by John Thomas, Jr., against Catherine Sullivan for the cancellation of a deed.   From a decree dismissing the bill, complainant appeals.   Reversed, and decree for complainant.

*Gore & Harvey*, for complainant.

*Lawrence C. Fyfe*, for defendant.

MOORE, C. J.   The parties to this litigation are brother and sister.   Their parents were John Thomas, Sr., and Catherine Thomas.   The bill is filed for the purpose of having a deed to certain real estate made in December, 1880, in which Catherine Thomas was grantor, and Catherine Sullivan was grantee, canceled.   The circuit judge refused to grant the prayer of the bill of complaint and dismissed the bill.   The case is brought here by appeal.

The record discloses that Catherine Thomas obtained title to the land described in the deed in 1863.   It was a vacant lot in the village of Benton Harbor at the time the deed in controversy was made.   After this deed was made, and before the death of the grantor, John Thomas, Sr., built a brick store building upon the premises, in the upper story of which he and his wife lived for a few years prior to her death, which occurred September 14, 1885.   After the death of Mrs. Thomas, John Thomas, Sr., continued to occupy and control the premises until his death, which occurred in August, 1901.

It is the claim of defendant, and she so testified, that after her mother's death her father told her he would carry the deed made by her mother in December, 1880, over to

the county seat, and have it recorded.    She also testified
that about 1893, in the presence of Mrs. Wright and Mr.
Hicks, her father took the deed out of his safe and deliv-
ered it to her, when she read it and Mr. Hicks read it,
and there was some talk about the necessity of its being
recorded; that she then gave the deed back to her father,
who returned it to the safe.    The testimony of Mrs. Wright
and Mr. Hicks tends to sustain this testimony, though
neither of them are very clear or positive in their state-
ments.    The following is a fair sample of the way Mrs.
Wright testified:

" *Q.* Tell us what was done and what was said there at
that time?    *A.* I think that at that time that he asked
Mr. Hicks if that deed would hold water, and I think that
Mr. Hicks made the statement that that deed was all right;
it was a genuine warranty deed.    And Mr. Thomas, I
think, made a statement of some little affairs that I could
not just remember or repeat the whole conversation, and
he said that that property at his death went to Mrs. Sulli-
van; and, if I remember right, Mr. Hicks took the deed
and read it, and handed it to Mrs. Sullivan, and she read
the deed.
  " *Q.* Then what was done?    *A.* I think Mrs. Sullivan
gave the deed to Mr. Thomas, and he put it in the safe.
  " *Q.* So that deed was handed to Mrs. Sullivan, and she
read it then and there?    *A.* Yes, sir.
  " *Q.* What did Mr. Thomas say to Mrs. Sullivan, if any-
thing, at that time he [Hicks] handed her the deed?    *A.*
I don't remember any particular conversation."

  The following from the testimony of Mr. Hicks will
show how indefinite his testimony was:

  "*Q.* Would you please tell us what the conversation
was at that time?    *A.* Well, Mr. Fyfe, I can only tell the
substance of it.
  "*Q.* Give us the substance of it.    *A.* The substance
was of inquiry from Mr. Thomas in reference to whether
that deed should be recorded or not, and I said at that
time it was not a necessity whatever; that Mrs. Sullivan
evidently owned the place, and it rested with her—some-
thing of that description—and he seemed to be satisfied.
She had the deed then in her hands, and I think I took it

from her and read it, and passed it back to her or him. I don't remember now. I can't remember.

"*Q.* Do you remember who gave her the deed? *A.* Well, to the best of my knowledge, he was sitting on a lounge. There is a lounge on the side of the room, and he sat on that, and I think he handed her the deed, or handed it to me. I think he handed her the deed. That is the best of my knowledge. That is as I remember it at present. In fact, it had got out of my mind until I heard Mrs. Wright state the facts here—state as she did—and it is quite a stretch of memory now to call it to mind."

A question is raised as to the competency of Mrs. Sullivan to testify, it being claimed that she was barred by the statute. It was also claimed that Mr. Hicks was not a competent witness, because he testified in relation to knowledge which came to him as the legal adviser of Mr. Thomas. It is also claimed that, giving the fullest effect to this testimony, it did not establish a delivery of the deed by Mr. Thomas to his daughter. Because of our view of another feature of the case, which will appear later, it is not necessary to pass upon either of the above questions. There is nothing in the record to show that, after this talk participated in by the father and daughter, Mrs. Wright, and Mr. Hicks, that any one but Mr. Thomas, Sr., had possession of the deed until after his death. The estate of Catherine Thomas was never probated. John Thomas, Sr., made a will, which was duly probated. His administrator with the will annexed took possession of the real estate described in the deed, and refused to pay the rental value thereof to John Thomas, Jr., and Catherine Sullivan. On December 23, 1901, they joined in a petition to the judge of probate, representing that "they were, and now are, the owners in fee simple, and entitled to the possession, use, rents, and income of the following described premises, to wit." Then followed a description of the land described in the deed, and a prayer that the administrator be required to account to them for rent. A few days thereafter Mrs. Sullivan received by mail the deed which had been recorded in the office of the

register of deeds. On the 27th of January, 1902, she withdrew her name from the petition. She testified that she did not know who sent the deed to the register's office, nor where it came from before it was sent there. The record does not disclose where the deed was found, or who sent it to the register. Mrs. Sullivan says that, when she joined in the petition referred to above, she supposed her father had destroyed the deed, and did not want to have litigation with her brother; that, when she learned the deed was in existence, she concluded to assert her rights under it.

So far we have not referred to what the record discloses in relation to why the deed was put in the possession of John Thomas, Sr., instead of being delivered by Mrs. Thomas to her daughter Mrs. Sullivan. All the testimony there is upon that subject is as follows: The deed was witnessed by Wells Brown and C. S. Boyle. It was admitted that Mr. Boyle was sick at the time of the trial, but, if present, would testify "that Mr. Thomas came across the street to his store and asked him to go over to his house, as he desired him to witness a paper, and he went over, and Mr. Wells Brown was there, and he saw a deed signed, and that Mr. Brown signed it, also himself, as a witness, and that Mr. Thomas told him he wasn't going to put it on record then, but wanted to have it ready, so that he could put it on record at some future time when it became necessary."

About four months before John Thomas died, he made a will in which he devised and bequeathed most of his property, including the property described in the deed, to his two children, John Thomas and Catherine Sullivan, share and share alike, and stated therein:

"This accords with the will of my wife Catherine I. Thomas, made verbally to myself, that whereas my son forced me out of the tanning business to the detriment of my business as a whole, and in disregard of any duty he might owe to his parents, a deed was made and given into my keeping, with the injunction of a mother's love, that

should my son do better thereafter, this deed should be destroyed and both children share alike."

It will be observed that Mr. Boyle does not suggest any direction by the grantor, Mrs. Thomas, as to what should be done with the deed. Mr. Thomas, in his will, says it was delivered with the injunction that, if the son did better, the deed should be destroyed. If this recital in the will is competent evidence, it is clear the condition has never arisen under which the deed was to be delivered to Mrs. Sullivan. If it is not competent evidence, then the record is bare of any direction upon the part of the mother that the father should deliver the deed to the grantee. The rule is well settled that, if a deed is delivered by the grantor to the grantee, the presumption arises that it is for his use, but, if it is handed to a stranger, there is no such presumption, for the delivering to the stranger may have been by mistake or for safe-keeping simply, or for some other purpose wholly independent of an intent to transfer the estate.

In *Trask* v. *Trask*, 90 Iowa, 318, it is said:

" A delivery to a third person does not authorize a presumption that it is done with the intention of passing the title. The facts and circumstances attending the transaction must be such as to show that the grantor intended that the deed should be delivered by the custodian to the grantee. Every such case must be determined by the intention of the grantor."

In *Mitchell's Lessee* v. *Ryan*, 3 Ohio St. 382, the court say:

"If the deed be delivered to the grantee, the natural presumption is that it is for his use, and no words are necessary. But if it be handed to a stranger, there is no such natural presumption; and hence, unless there be something besides the mere act of delivery to evidence the intent, it is impossible to say that the grantor designed to part with the title. For the delivery may be by mistake, or for mere safe-keeping, or for some other cause wholly independent of a purpose to transfer the estate."

We understand this to be the rule.

It is clear, we think, that there is an entire failure to show a delivery of the deed to John Thomas, Sr., with the intent to have it transfer the estate to Catherine Sullivan. We deem it unnecessary to discuss the other interesting questions raised by counsel.

The decree is reversed, and one will be entered here granting the relief prayed, with costs of both courts.

The other Justices concurred.